IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 26, 2020

## STATE OF TENNESSEE v. JOHN CHRISTOPHER SCHUBERT

**Appeal from the Criminal Court for Knox County**
**No. 107317   Steven Wayne Sword, Judge**

_____

### No. E2019-01257-CCA-R3-CD

_____

A jury convicted the Defendant, John Christopher Schubert, of aggravated robbery, robbery, theft, tampering with evidence, resisting arrest, and disorderly conduct. The Defendant received an effective eighteen-year sentence. On appeal, the Defendant contends that the State presented insufficient proof regarding his identity, that his convictions for resisting arrest and disorderly conduct violate the prohibition against double jeopardy, that the trial court improperly admitted hearsay evidence, and that the trial court erroneously gave an instruction on flight. After a thorough review of the record, we discern no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and NORMA MCGEE OGLE, JJ., joined.

Gerald L. Gulley, Jr. (at motion for a new trial and on appeal), Knoxville, Tennessee, and Michael T. Cabage (at trial), Knoxville, Tennessee, for the appellant, John Christopher Schubert.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Assistant Attorney General; Charme Allen, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was implicated in the masked robbery of two convenience stores and in the theft of a BB gun from a Walmart immediately prior to the robberies. Upon arrest, the Defendant attempted to flee and created a disturbance by shouting, and he subsequently tore up a detective's written notes from an interview with an accomplice. He was charged with two counts of aggravated robbery, theft, tampering with evidence, resisting arrest, and disorderly conduct. The Defendant contested the proof regarding identity. The State attempted to link the Defendant to the offenses by presenting video evidence of the robberies and theft, presenting DNA evidence linking the Defendant to certain items of clothing found with the Defendant and consistent with those worn by the robber, and presenting evidence that the Defendant and two others were apprehended in a vehicle matching the suspect's vehicle with a BB gun, the packaging for the BB gun, and currency consistent with that taken during the robberies.

At 1:50 a.m. on May 2, 2015, Ms. Cathy Phillips was working at a Bread Box convenience store on Millertown Pike when a man entered, holding a gun "sideways" and pointing it at Ms. Phillips. The man had "something" over his face so that only his hands and eyes were exposed, and he appeared "fidgety." The man screamed for her to "give it to him," which she interpreted as a demand for money. Ms. Phillips was the manager on duty, and having recently dropped some money into the safe, she knew that one register contained eighteen $1 bills and that the other was empty. She gave the man the eighteen $1 bills and opened the other register to show that it was empty. Ms. Phillips saw the headlights of a vehicle coming to the store, and the man ran out. Ms. Phillips could not identify her assailant as the Defendant because the assailant had a covering on his face. Ms. Phillips was "scared … to death" and ultimately quit her job. She called the police when the assailant left.

A video of the parking area showed the assailant exiting the back seat of a teal car, which then drove off. The assailant ran away on foot after the robbery in the same direction the teal car had driven. The video of the store's interior showed a man with a covering on his face robbing the store and pointing a gun at Ms. Phillips. The man was wearing dark pants and a dark shirt with white stitching and a logo.

The Millertown Bread Box was not the only store to be robbed that night. At approximately 2:00 a.m., Mr. Russell Cotter was working at the Asheville Highway Bread Box convenience store and had gone outside for a break. There was very little traffic, and Mr. Cotter noticed a mid-1990s to early 2000s model Buick drive by and turn down the road next to the store. Approximately one minute later, a man wearing what

Mr. Cotter described as a "ski mask" approached Mr. Cotter in the parking lot and told him to open the registers. The man's gestures and motions, along with the fact that the man kept one hand relatively still, made Mr. Cotter think the man was armed, but Mr. Cotter never saw a gun. Mr. Cotter went inside with the man, opened the register, and placed the till on the counter, and the robber took approximately $60 or $70. Mr. Cotter testified that he was in fear during the robbery. He agreed it was possible that he told police the amount taken was $120. He did not recall telling police the color of the vehicle, but he agreed he probably said the vehicle was "bluish" if that information was in the warrant.

Investigator Jason Booker with the Knoxville Police Department obtained a description of the vehicle from Mr. Cotter, and he reviewed videos of the Asheville Highway robbery. The videos of the robbery showed a man enter the store with Mr. Cotter. The man had a covering on his face exposing only two holes for his eyes. During a time when Mr. Cotter was engaged with the register, the assailant's mask came down, revealing that it was not a "ski mask" as it first appeared to be but some sort of cloth placed across the face. The assailant adjusted the cloth so that it returned to his face and took money from the register. The assailant had dark facial hair and was wearing dark pants and a dark shirt with white stitching and a logo. Mr. Cotter agreed that a still photograph from the video showed both of the robber's hands and that neither of the robber's hands held a weapon.

Officer Jason Kalmanek was responding to the robbery at the Millertown Bread Box when he heard the report of the second robbery at the Ashville Highway Bread Box, which was located approximately five to ten minutes from the Millertown Bread Box. Investigator Booker instructed Officer Kalmanek to drive to an area east of the second robbery, where he suspected any subsequent robbery would take place, and to be on the lookout for a "bluish" colored Buick. Officer Kalmanek continued past the locale of the second robbery to the next exit, and he passed a "greenish" or teal Buick traveling the opposite direction. He testified that there were "almost no cars out" and that he began to turn his patrol vehicle around to follow the Buick. As soon as Officer Kalmanek "pulled around," the Buick quickly "jetted" into the parking lot of a restaurant, despite the fact that the restaurant was closed. Officer Kalmanek's suspicions were heightened by the vehicle's act of turning quickly into a closed restaurant parking lot, and he followed the vehicle, activated his lights, and called for backup. The car had three occupants: a woman who was driving and had no license with her, a man in the front seat, and the Defendant in the back seat.

The occupants were separated, and the car was searched pursuant to the driver's consent. Officer Nelson Hamilton and Officer Sam McLane discovered the muzzle of a BB gun sticking out from under the passenger's seat, where it would have been

accessible to the Defendant. Officer Kalmanek and Officer Hamilton agreed that the front seat passenger could also have had access to the weapon but stated that the weapon was closer to the back of the vehicle. Ms. Stephanie Housewright, a crime scene technician for the Knoxville Police Department, agreed that typically, the bearer of a firearm would position the muzzle pointed away from the bearer and that the muzzle was pointed toward the back seat. Ms. Housewright photographed the occupants of the car and the BB gun, which she testified was similar in appearance to a real gun. She also collected the empty packaging of the BB gun from the car.

In addition to the BB gun, Officers Hamilton and McLane discovered clothing in the back seat. Ms. Housewright collected and photographed a Carhartt jacket, a black shirt with white stitching and a white logo over the left chest, and a pair of jeans that were turned inside out when they were recovered. The vehicle also contained a piece of blue cloth. Officer Hamilton agreed that no ski mask was recovered. Investigator Booker testified that he had seen masks made from cut-up t-shirts or shirt sleeves and that the blue cloth had an area "scalloped" out for eyes so that the cloth could have been worn over the face. Inside the pocket of the blue jeans, law enforcement recovered eighteen $1 bills. Cash was also recovered from the pocket of the man in the passenger's seat. Investigator Booker stated that they recovered approximately $40 in $5 bills and fifteen $1 bills. He acknowledged that the clerk stated that approximately $120 was taken, that the manager who arrived later stated that $81 was missing, and that the recovered amount did not match either figure.

Officer Kalmanek testified that after the search, he removed the Defendant from a police vehicle and attempted to put handcuffs on him and to transfer him to another vehicle. The Defendant resisted and succeeded in running away for a distance of about ten to fifteen feet, at which point Officer Hamilton tackled him. Officer Hamilton stated that he observed the Defendant "run for it." The Defendant "flip[ed]" Officer Kalmanek to the ground as Officer Kalmanek tried to wrap his legs around the Defendant to stop him. Officer Hamilton then "engaged with" the Defendant. According to Officer Kalmanek, the Defendant continued to resist being handcuffed after Officer Hamilton tackled him, and the Defendant sustained injuries which the paramedics were summoned to treat. Officer Hamilton stated that the Defendant's injuries originated "[p]robably from where I was hitting him," noting that he struck the Defendant immediately because he had seen him fight with Officer Kalmanek. Officer Kalmanek testified that after the paramedics were summoned, the Defendant was yelling, "wasn't making it easy on" the paramedics treating him, and was generally uncooperative.

Investigator Booker interviewed the driver and the man in the passenger's seat at the police station prior to interviewing the Defendant. He took notes from the interviews on a notepad, and he recorded the interviews on a digital recorder. Investigator Booker

began to interview the Defendant, who did not wish to give a statement, and he was called out of the room. He inadvertently left his notes and the digital recorder in the room with the Defendant, whose hands were handcuffed behind his back. A video of the interview room showed the Defendant look through Investigator Booker's notes using his handcuffed hands, eventually single out a page, tear it out from the notebook, then crumple the page and attempt to pocket it. The Defendant also pressed buttons on the recorder, eliciting several beeps. He rearranged the table so that it appeared undisturbed, then he took the paper out of his pocket and began to tear it up, stating that it was "lies." Officer Hamilton testified that he witnessed the Defendant tearing up some paperwork when he went to check on him. Officer Hamilton retrieved the papers. In the video, the Defendant said, "I didn't mean to tear it up. I was going to keep it." Investigator Booker stated that the Defendant succeeded in destroying the recordings on the digital recorder; however, Investigator Booker had video recording of the interview from equipment installed in the interview room. He was able to piece together the torn up page of his notes, which contained information from his interview with the driver.

The Defendant objected on hearsay grounds to the introduction of the notes which had been torn up and taped together. The paper contains a notation that states, "Lee's mkt was with Jimmy" and "Lee's Mkt Exxon on Rut Pk twice w/ Brandon Graves." Regarding the night of May 2, 2015, the notes reflect that the driver told Investigator Booker that the three occupants of the car had been together when "Chris" said he was going to Walmart. He came out with a BB gun. "Chris" then tried to steal a van and went to Walgreens. The notes reflect that "Chris takes ATMs from stores." The trial court concluded that the torn-up and taped-together page was pertinent to the Defendant's intent in destroying the evidence and that it was relevant to his state of mind. The court instructed the jury, "[Y]ou cannot consider [the evidence] for the truth of what is purportedly being said by this other person. However, it could be material evidence to you if you believe that the Defendant had an intent or knowingly was trying to destroy evidence of a crime. And so if that's the case, you can consider it for that purpose."

After conducting interviews with the occupants of the vehicle, Investigator Booker spoke with employees at Walmart and reviewed surveillance footage from inside the store. Mr. Gary Ricker testified that around 12:18 a.m. on May 2, 2015, videos revealed that a man entered the store, concealed an air pistol in his clothing, and left without paying. The air pistol looked similar to a working firearm. He agreed that the video was in general "fuzzy" and that the clip showing the man conceal the item was not clear. The video and a still photograph were entered into evidence.

Investigator Booker noted that the Walmart and robbery videos showed an individual whose facial hair matched the Defendant's and who was wearing the same dark pants and dark shirt with contrasting white stitching. The man arrested in the front

passenger's seat of the vehicle did not have similar facial hair. The Walmart video showed that the thief had a gray shirt under the long-sleeved dark shirt, and the Defendant was wearing a gray t-shirt when arrested. Although the Defendant was wearing shorts and not pants, the jeans recovered from the vehicle were inside-out as though "somebody had taken them off kind of in a hurry."

Ms. Housewright was not able to recover fingerprints from the Bread Box stores or from the items found in the vehicle. She did collect a BB gun magazine from the parking lot area of the Millertown Bread Box. Investigator Booker submitted the dark shirt with white stitching, the jacket, and the blue cloth for DNA testing. Mr. Eric Baker of Sorenson Forensics performed the DNA testing and concluded that the Carhartt jacket contained a mixture of DNA from at least two individuals, with the Defendant excluded as a contributor. The black, long-sleeved shirt contained a mixture of DNA from four contributors, and the DNA from the major contributor was consistent with the Defendant's DNA but was not conclusively his DNA. The blue cloth had a mixture of DNA from at least three contributors, and the DNA of the major contributor matched the DNA of the Defendant.

The Defendant presented testimony from Investigator Booker, who disagreed that the torn-up notes were unrelated to his investigation of the robberies. He stated instead that the notes were relevant to the origin of the BB gun. He agreed that although the digital recording was erased, he had a recording of the interviews on other media.

The trial court instructed the jury on flight over the Defendant's objection. The jury convicted the Defendant of the aggravated robbery of Ms. Phillips, the lesser-included offense of the robbery of Mr. Cotter, theft, tampering with evidence, resisting arrest, and disorderly conduct. After a sentencing hearing, the trial court imposed concurrent sentences of eighteen years for aggravated robbery, fifteen years each for robbery and tampering with evidence, eleven months and twenty-nine days each for theft and resisting arrest, and thirty days for disorderly conduct. The Defendant moved for a new trial, including challenges to the sufficiency of the evidence, the introduction of Investigator Booker's notes, and the flight instruction. The motion for a new trial was denied, and the Defendant appeals.

## ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence, including in his challenge the assertion that his convictions for resisting arrest and disorderly conduct violate the prohibition against double jeopardy. The Defendant also asserts that the trial court erred in permitting the jury to see the taped-together sheet of Investigator Booker's

notes and that it erred in instructing the jury on flight. Discerning no error, we conclude the Defendant is not entitled to relief.

## I. Sufficiency of the Evidence

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The offense of theft required the State to show that, with the intent to deprive the owner of property, the Defendant knowingly obtained or exercised control over the property without the owner's effective consent. T.C.A. § 39-14-103(a). The offense of robbery is established when an intentional or knowing theft of property is accomplished by violence or putting the person in fear. T.C.A. § 39-13-401(a). Robbery is aggravated when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1).

In order to convict the Defendant of tampering with evidence as charged here, the State was required to show that, knowing that an investigation or official proceeding is pending or in progress, the Defendant altered or destroyed a record with the intent to impair its availability as evidence in the investigation. T.C.A. § 39-16-503(a)(1).

To convict the Defendant of resisting arrest as charged, the State had to show that the Defendant intentionally prevented and[1] obstructed a person known to him to be a law enforcement officer from effecting an arrest by using force against the law enforcement officer. T.C.A. 39-16-602(a). To prove disorderly conduct as charged, the State had to show that the Defendant recklessly, knowingly, or intentionally made unreasonable noise that prevented others from carrying on lawful activities. T.C.A. § 39-17-305(b).

The Defendant does not contest that the foregoing elements of these offenses were established. Indeed, the State introduced evidence that the Defendant took a BB gun from Walmart without paying for it; took cash from two Bread Box stores by putting the clerks in fear and while brandishing the weapon at one store; altered Investigator Booker's notes[2] by tearing them up and attempting to hide them; flipped Officer Kalmanek to the ground in order to effect a temporary escape; and yelled in such a way that the paramedics had difficulty treating him.

Instead, the Defendant challenges only the sufficiency of the evidence establishing his identity as the robber of the convenience stores and as the thief of the BB gun from Walmart. Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *Pope*, 427 S.W.3d at 369 (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)). Circumstantial evidence may establish identity. *Bell*, 512 S.W.3d at 198-99 (concluding circumstantial evidence that the defendant was the perpetrator was sufficient to uphold the verdict).

Here, the State presented video evidence that a BB gun was stolen from Walmart by a man resembling the Defendant and with facial hair matching the Defendant's facial hair. The thief was wearing dark pants and a black, long-sleeved shirt with contrasting white stitching and a small white logo on the left of the chest. Very shortly thereafter, at the Millertown Bread Box, a man wearing a mask and clothing matching that of the thief from Walmart robbed the clerk of eighteen $1 bills. The man used a gun which appeared to be the BB gun, and a BB gun magazine was recovered from the parking lot. Video showed the robber exit the back seat of a teal vehicle in the parking lot of the Millertown

---

[1] The statute uses the disjunctive, but the jury instructions used the conjunctive. The effect of this was to increase the burden on the State. *See State v. Antoine Dewayne Clark*, No. M2017-02525-CCA-R3-CD, 2019 WL 410705, at *6 (Tenn. Crim. App. Jan. 31, 2019), *no perm. app. filed*.

[2] During closing argument, the prosecutor stated that the Defendant's act of tearing up the notes was the basis for this charge.

Bread Box and revealed that the robber fled on foot toward the direction the vehicle had gone. Shortly thereafter, during an early morning lull in traffic, a "bluish" Buick drove past the Asheville Highway Bread Box. A man then robbed the store, wearing a mask and the same outfit as the suspect in the prior offenses. The man's mask briefly slipped off, revealing his face and facial hair matching the Defendant's. The Defendant and his companions were stopped in a teal Buick a few minutes later in a nearby location. The Defendant was in the back seat. Also in the back seat was a dark shirt with contrasting white stitching and a logo matching that of the perpetrator of the offenses and a blue piece of cloth with "scalloped" areas which matched the mask. A BB gun was within reach of the Defendant, and the BB gun's packaging was also in the vehicle. Next to the Defendant on the back seat, inside out as though "somebody had taken them off kind of in a hurry," was a pair of jeans with eighteen $1 bills in the pocket. The shirt matching that worn by the perpetrator of the theft and robberies had DNA consistent with the Defendant's, and the blue cloth which appeared to be the mask had the Defendant's DNA on it. Other cash, although not matching the amount surmised to be missing from the second robbery, was found in possession of another individual in the vehicle. We conclude that the evidence of the Defendant's identity as the thief and robber was sufficient for a rational trier of fact to find that he was the culprit beyond a reasonable doubt.

## II. Double Jeopardy

The Defendant also asserts that the evidence is insufficient to convict him simultaneously of both resisting arrest and disorderly conduct. The State correctly observes that this argument does not relate to the sufficiency of the evidence but to whether the dual convictions violate double jeopardy.

We note initially that this issue does not appear to have been raised before the trial court. The written motion for a new trial and amended motion for a new trial did not include this issue. The transcript for the motion for a new trial is absent from the record. The State does not assert waiver. While the issue appears to be waived, it is clear in any event that the offenses are not based on the same act or transaction. *See State v. Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018) ("To preserve the double jeopardy issue, [the defendant] had to raise it in his motion for new trial and appellate brief."); *State v. Watkins*, 362 S.W.3d 530, 545 (Tenn. 2012) ("When a court determines that separate convictions do not arise from the same act or transaction, then there cannot be a double jeopardy violation; thus, courts need not proceed to the second step of the *Blockburger* [*v. United States*, 284 U.S. 299, 304 (1932)] test."). The resisting arrest charge was based on the Defendant's escape from the custody of Officer Kalmanek. The disorderly conduct charge was based on the unreasonable noise created by the Defendant as paramedics attempted to treat him. The Defendant is not entitled to relief.

### III. Hearsay

The Defendant also asserts that the trial court erred in allowing the paper with Investigator Booker's notes to be admitted as evidence because they contained hearsay and that the statements were so prejudicial that the jury would be unable to follow the trial court's limiting instructions. Because the evidence was admitted as non-hearsay offered not for the truth of the matter asserted but for the purpose of establishing the Defendant's mens rea, the Defendant is not entitled to relief based on his hearsay objection.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. An appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

Here, the Defendant had been arrested as a suspect in two robberies which authorities believed had been committed with the BB gun recovered from the car. The Defendant, with his hands handcuffed behind his back, tore a page of notes out of Investigator Booker's notebook, crumpled it up and put it in his pocket, and then removed it from his pocket and tore it up. The Defendant told law enforcement that he "didn't mean to tear it up" but "was going to keep it." The page contained information purportedly given by the driver of the vehicle to Investigator Booker, including allegations that "Chris" stole a BB gun from Walmart and allegations of other bad acts. The Defendant was convicted of tampering with evidence, which as charged, required the State to show that, knowing an investigation was in progress, he altered or destroyed a record "with intent to impair its … availability as evidence in the investigation." T.C.A. § 39-16-503(a)(1).

Accordingly, it was necessary to establish the Defendant's intent in tearing up the piece of paper. The State moved to put the taped-together paper into evidence, and the Defendant objected only on hearsay grounds. The trial court determined that the note was not being offered for the truth of the matters asserted in it. The court gave the jury a limiting instruction that it could not consider the truth of what the driver had purportedly said but could only consider the evidence to determine if "the Defendant had an intent or knowingly was trying to destroy evidence of a crime."

The Defendant objects to the admission of the document as hearsay. Because the document was not offered for the truth of the matters asserted therein but only to show

that the Defendant's act of tearing up the paper was done with the intent of impairing a document's availability as evidence, the note was not hearsay or subject to exclusion as hearsay. The Defendant cites to *United States v. Jones* for the proposition that "[t]he presumption that a jury will adhere to a limiting instruction evaporates where there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense." 16 F.3d 487, 493 (2d Cir. 1994). *Jones* dealt with a refusal to sever or bifurcate a trial in order to prevent prejudicial proof of a prior felony that was not relevant to the other offenses on trial, and it concerned the trial court's attempt to instruct the jury to ignore the defendant's status as a convicted felon. *Id.* at 492. Here, the Defendant challenges the admission of hearsay and the jury's ability to remove the truth of the matter asserted from consideration. The Defendant presents nothing other than an assertion that the jury may have failed to follow the court's instructions. The law in Tennessee is that a jury is generally presumed to follow a trial court's instructions. *State v. Jordan*, 325 S.W.3d 1, 55 n.12 (Tenn. 2010); *see State v. Brandon Churchman*, No. W2013-00175-CCA-R3-CD, 2014 WL 12651043, at *11 (Tenn. Crim. App. Apr. 28, 2014) (the jury was presumed to follow the trial court's instructions regarding prejudicial evidence offered not for the truth of the matter asserted but for its effect on law enforcement's investigation). The evidence did not constitute hearsay because it was not offered for the truth of the matters asserted in the letter. Because we presume that the jury followed the trial court's limiting instructions, we conclude that the Defendant is not entitled to relief on his hearsay challenge.

## IV. Flight

The Defendant also asserts that the trial court committed error in giving the jury an instruction on flight because he contends that the evidence did not support the instruction. We conclude that there was sufficient evidence that the Defendant left the scene and subsequently evaded police to permit the trial court to instruct the jury on flight, and the Defendant is not entitled to relief.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016).

Flight or attempted flight may bear on the defendant's intent, purpose, or consciousness of guilt and may connect the accused with the commission of the offense. *Rogers v. State*, 455 S.W.2d 182, 186 (Tenn. Crim. App. 1970). When the jury is presented with evidence of flight, it may draw an inference of guilt after considering the

circumstances of flight in the absence of an explanation of the "'reasons or motive'" for the flight. *Id.* at 186-87 (quoting 22A C.J.S. Criminal Law § 625). Flight requires both a leaving of the scene and a subsequent act indicative of an intent to flee:

> "The law makes no precise distinction as to the manner or method of [a] flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

*Dorantes*, 331 S.W.3d at 388 n.16 (quoting *Rogers*, 455 S.W.2d at 187). "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979). In order for the flight instruction to be warranted, sufficient evidence must exist to support the instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004) (appendix).

Here, two convenience stores were robbed in quick succession, and the offender left the scene of both crimes. The video from the exterior of the Millertown location showed the perpetrator running away as a vehicle approached the gas station. In the early morning hours, when "almost no" vehicles were out, Officer Kalmanek noticed a vehicle matching the description of the vehicle associated with the Asheville Highway location robbery. He testified that when he turned his patrol car around, the vehicle "jetted" into the parking lot of a fast-food restaurant, despite the fact that the restaurant was closed. Officer Kalmanek's testimony was essentially that the blue Buick changed course and stopped at a closed restaurant on observing his patrol vehicle. Although the evidence supporting the flight instruction was slight, we conclude that there was sufficient evidence of a hurried departure from the crime scene and a subsequent evasion to warrant the instruction regarding flight. *See State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994) (a flight instruction was warranted when police investigating a homicide discovered a car stuck in the mud with the engine still warm and the victim's stolen belongings around the car and it could be inferred that the offender had recently fled, even though the identity of the defendant, who was tied to the crime by physical evidence, was not discovered until a year later, and concluding that even if erroneous, the instruction was harmless); *State v. Shawn Simmons*, No. M2009-01362-CCA-R3-CD, 2010 WL 3719167, at *5 (Tenn. Crim. App. Sept. 23, 2010) (evidence that the defendant left the scene and then evaded police by walking briskly away from the police prior to surrendering was sufficient for flight instruction). In any event, the instructions properly informed the jury that "whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt." *Smith*, 893 S.W.2d at 918; *see*

*Shawn Simmons*, 2010 WL 3719167, at \*5 (flight instruction was warranted, but any error was harmless); *see also State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005). The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the trial court's judgments.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE